IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH - CENTRAL DIVISION

| | |
|---|---|
| In Re,<br><br>REAL PROPERTY LOCATED AT [REDACTED] JUPITER DRIVE, SALT LAKE CITY, UTAH<br><br>And<br><br>REAL PROPERTY LOCATED AT [REDACTED] SOUTH LEDGEMONT DRIVE, SALT LAKE CITY, UTAH<br><br>Defendants. | ORDER ADOPTING THE FIRST REPORT AND RECOMMENDATION OF THE SPECIAL MASTER<br><br>Judge Dee V. Benson<br><br>Case No.: 2:05-CV-1013 |

In the wake of a failed investment scheme involving the development of two parcels of property, a number of secured and unsecured claimants have been left to recover what they can of their investments. On February 13, 2007, the Court appointed a special master pursuant to Rule 53 of the Federal Rules of Civil Procedure to determine who is now entitled to what portion of what remains of the moneys invested by the various claimants.

The Special Master made his First Report and Recommendation June 7, 2007. Dkt. No. 248. The subject matter of the First Report and Recommendation was limited to the argument advanced by a number of unsecured claimants that distribution of the proceeds of the sale of the properties should made on a pro rata basis rather than on the basis of lien priority, and to determining whether interest continues to run after the date a receivership is initiated. The Special Master conducted two hearings and considered the arguments of all parties with an interest in the matter and concluded that the proceeds should be distributed on the basis of lien priority and that interest continues to run after establishment of a receivership. Having

conducted a de novo review of the Report and Recommendation and the objections to it, the Court now ADOPTS the First Report of the Special Master.

It is so ordered.

DATED this 31st day of August, 2007.

_____
Dee Benson
United States District Judge

IN THE UNITED DISTRICT COURT FOR THE

DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| IN RE<br><br>REAL PROPERTY LOCATED AT [REDACTED] JUPTIER DRIVE, SALT LAKE CITY, UTAH,<br><br>and<br><br>REAL PROPERTY LOCATED AT [REDACTED] SOUTH LEDGEMONT DRIVE, SALT LAKE CITY, UTAH<br><br>Defendants. | FIRST REPORT AND RECOMMENDATION OF THE SPECIAL MASTER<br><br>Case No.: 2:05-CV-01013-DB<br><br>Honorable Dee V. Benson<br><br>Special Master Michael Zimmerman |

This report is prepared and will be filed with Chief Judge Dee V. Benson of the United States District Court for the Central District of Utah in accordance with that court's order of February 13, 2007. The February 13 order appointed the Special Master and provided that the "Master is directed to proceed with all reasonable diligence to accomplish his duties, which are to consider evidence, to hear legal arguments, and to perform all other tasks necessary to file a report recommending the final distribution of the assets of this Receivership Estate. The Master's duties also include adjudication of issues raised or to be raised in the Third-Party Complaint filed by the Receiver, determination of a pending motion for approval of extension agreement, and any other undetermined matters pending before the District Court in this action." Order of 2/13/07 at 2-3. Objections to the Special Master's findings of fact, conclusions of law, and recommendations are to be reviewed by the District Court de novo. Id. at 4.

The present report is directed only to the overarching questions raised by the pending motions regarding: (i) whether the distribution of receivership assets should be on a pro rata basis or according to state law lien priorities; and (ii) whether the running of interest on the loans should cease as of the date of the institution of the receivership, or should continue to accrue up to the date of payment. Because the assets of the receivership are far less than the claims made, the disposition of these two questions will have a profound effect of the claims of all but the most senior creditors.

## I.   FACTUAL BACKGROUND

This case involves an investment scheme involving the purchase and proposed development of certain real property, part of which is located on Jupiter Drive in Salt Lake County. The investment scheme was to involve the development of two parcels of

1

land in Salt Lake County, the "House Parcel" (sometimes referred to as the "Jupiter Property") located at 4646 South Jupiter Drive and the "Land Parcel" (sometimes referred to as the "Ledgemont Property"), a contiguous parcel of vacant land. The scheme was perpetrated by Baylor Stevens, who obtained a variety of loans from a variety of sources for a total amount that exceeded the value of the property. Some of the loans were secured by trust deeds and some of the loans were not so secured.

According to factual assertions made by the unsecured claimants (the "Investors"), the Investors made bridge loans to Stevens in return for Stevens' alleged promise to pay these loans off "with enticing interest rates within only a few months", apparently by using funds acquired as a loan from a "large lender".[1] (B. Stevens 4/13/07 Br. at 4.) Stevens allegedly portrayed the project to these investors "as an investment project intended to generate quick and large revenues." (Id. at 3.) None of the Investors received a security interest in the property nor did they otherwise collateralize their advances. The Investors argue that each of their advances to Stevens became secured by the property through one of two mechanisms: (i) by the filing of a "notice of interest" that was not signed by Stevens, but that was recorded against the property before December 6 of 2005, the date of the receivership's initiation; and (ii) by the filing with the court in January of 2006 of trust deeds executed by Stevens. A number of institutional lenders also advanced funds to Mr. Stevens to purchase and improve the property (hereafter, collectively, the "Lenders").[2] Those loans were properly secured by the two pieces of real property.

Stevens paid back none of the advances from the Investors and defaulted on all of the loans made by the Lenders. Eventually, the United States Attorney for the District of Utah instituted criminal proceedings against Stevens and sought the establishment of a receivership over the two parcels of land for the benefit of Stevens' creditors, or victims, depending on their characterization. The district court ordered the establishment of the receivership over the two parcels of land on December 6, 2005. It also directed that a claims procedure be established. The court-appointed receiver, Matthew C. Barneck, obtained court approval to sell the property. In the court's September 1, 2006 order, it provided that all liens against the property would be "transferred to the proceeds of the sale with the same priority, character, rank, and dignity as they bore . . . prior to the sale, if any."

The proceeds of the property sale, after expenses of administration, are likely to be somewhat less than $2.6 million. This is far below the more than $4.3 million in claims made, of which more than $3.8 million represents secured claims. If the secured Lenders are given priority over the unsecured Investors, it is very unlikely that Investors will receive any money.

In early December of 2006, the court held a hearing to determine several questions regarding the claims filed. At that hearing, a number of the Investors appeared

---

[1] The Investors include Burk Stevens, Jim Ackerman, Cris Stevens, Ronald Stevens, Charles and Alesha Higgins, Clyde Stevens, Melanie Comerio, Justin Manning, Matt Lemmon, Travis Manning, Jeremy Layton, and Johnny Jackson.

[2] These claimants include Washington Mutual Bank ("Wamu"), Lighthouse Capitol Funding, Inc. ("Lighthouse"), Weenig Management Group ("Weenig") Stewart Title Guaranty Company ("Stewart"), and the Bank of Idaho as trustee for Clark Real Estate Company, Heights Inc., and Loan One LLC ("Clark").

and contended that the court should order the proceeds distributed to all creditors pro rata, rather than in accordance with their relative lien priorities. The Lenders objected. The Lenders, who it is undisputed have properly secured and recorded their liens through trust deeds on the property, argue that claimants fall into distinct categories, most notably "secured" and "unsecured" and that the assets should be distributed according to their legal priority. They argue that Utah law governs the priority of liens on a piece of real property, and that a lien in a receivership loses none of its legal entitlements, including its priority and its right to accrue interest until paid. In addition, several of the secured lenders challenged other secured lenders' claims on various grounds.

On February 13, 2007, the court appointed the Special Master and directed that he address, inter alia, the pending motions. On March 27, 2007, the Special Master held a hearing at which many of the Investors and counsel for all Lenders appeared. All had an opportunity to be heard as to how the matter should proceed. At the conclusion of the hearing, a briefing schedule was set for the various issues pending, and an additional hearing date was set. That hearing was held on April 30, 2007. The present report and recommendation addresses the two overarching issues of whether pro rata distribution is appropriate and whether interest continues to run after the date of the initiation of the receivership. A second report and recommendation will follow addressing all remaining issues upon which briefing was not completed until the end of May.

## II. SHOULD PROCEEDS OF THE SALE OF THE PROPERTIES BY THE RECEIVER BE DISTRIBUTED PRO RATA OR ACCORDING TO THE RELATIVE PRIORITIES OF THE CLAIMANTS UNDER UTAH LIEN LAW?

The first question presented is whether the receiver should distribute the proceeds of the sale of the two properties placed into the receivership according to the various claimants' relative legal lien priorities, or whether the proceeds should be distributed to all claimants on a pro rata basis with each claimant being treated the same as every other. As outlined above, the claimants can be divided into two broad categories, those with unsecured claims and those with secured claims. The legal question is whether a pro rata distribution treating all claims as equivalent is appropriate where both secured and unsecured claims are presented. Although a court administering an equity receivership has discretion in the distribution of the assets, the general rule is that a court should respect lien priorities created under state law. Under Utah law, it is clear that secured creditors have priority over unsecured, and that among secured creditors, the date of perfection determines relative priorities. The question presented is whether Utah law needs to be respected in this case.

### A. The general rule is that state law lien priorities should be honored in the distribution of receivership assets and that a district court does not have general authority to ignore state law in the name of equity.

It is well-established that a "receiver appointed by a federal court takes property subject to all liens, priorities or privileges existing or accruing under the laws of the State." Marshall v. New York, 254 U.S. 380, 385 (1920). It is equally well-established that "a receiver holds the property coming into his hands by the same right and title as the

3

person for whose property he is receiver, subject to liens, priorities, and equities existing at the time of his appointment." Cates v. Musgrove Petroleum Corp., Inc., 376 P.2d 819, 821 (Kan. 1962); Maxl Sales Co. v. Critiques, Inc., 796 F.2d 1293, 1297 n.2d (10th Cir. 1986) (holding that "appointment of a receiver does not determine any rights nor destroy any liens"); Ticonic National Bank v. Sprague, 303 U.S. 406, 412 (1938) (holding that "'liens, equities or rights arising prior to insolvency and not in contemplation thereof, are not invalidated'"); Grubb v. FDIC, 833 F.2d 222, 225 (10th Cir. 1987) (same). The Supreme Court has also held that "to the extent that one debt is secured and another is not there is manifestly an inequality of rights between the secured and unsecured creditors, which cannot be affected by the principal of equality of distribution." Ticonic National Bank, 303 U.S. at 411-412.

In response, the Receiver and the Investors argue that the district court's power to supervise an equity receivership is "extremely broad" and that the court has "wide discretion" in such supervision because "most receiverships involve multiple parties and complex transactions." SEC v. Capital Consultants, LLC, 397 F.3d 733, 738 (9th Cir. 2005) (quoted in Receiver Mem. in Response to Primary Issue at 3-4). Specifically, Burk Stevens, one of the Investors who has served de facto as a spokesperson for them, cites United States v. Vanguard Investment, Co., 6 F.3d 222, 226 (4th Cir. 1993), in support of his argument that the district court's discretion in supervising a receivership includes the ability to deny "state law remedies" in dealing with receivership assets. (B. Stevens 4/13/07 Br. at 5.) He claims that state law respecting lien priorities can be ignored because it relates to a creditor's "remedies." The Special Master concludes that Vanguard cannot legitimately be so read. It does not hold that any and all state laws regarding a creditor's remedies may be ignored, but rather that under certain circumstances a district court supervising a receivership may deny equitable remedies that might otherwise have been available to a creditor. Id. at 227. State lien priority law is not an "equitable remedy" of a creditor, but a legal status that a creditor enjoys vis a vis an asset.

The Special Master is not aware of any court that has explicitly held that the priority of liens as established by state law can be ignored simply because a receivership is in place. Therefore, it is recommended that the court be governed by the general rule that state law regarding lien priorities is to be respected in receiverships, and by the district court's September 1, 2006 order that all liens against the property ordered sold by the Receiver would be "transferred to the proceeds of the sale with the same priority, character, rank, and dignity as they bore . . . prior to the sale, if any."

If the court is to distribute the proceeds on a pro rata basis, it must be because of some factor other than the claimed existence of a general discretionary power to treat claimants in a receivership according to unspecified notions of "equity".

### B. Pro rata distribution is not justified on grounds that secured and unsecured claimants are "similarly situated."

Although general legal principles suggest that proceeds in the hands of a receiver should be distributed according to state lien priority law, the Investors and the Receiver assert that case law allows a pro rata distribution when claimants are "similarly situated"

4

with respect to the debtor and their assets were commingled. They contend that such a situation obtains here.

Courts have recognized that pro rata distribution is proper where "the funds of the defrauded victims were commingled and where victims were similarly situated with respect to their relationship to the defrauders." SEC v. Credit Bancorp, Ltd., 290 F.2d 80, 88 (2d Cir. 2002); SEC v. Merrill Scott & Assocs., 2007 U.S. Dist. LEXIS 690, at *5 (D. Utah Jan. 7, 2007). The Investors and the Receiver contend that the Investors and the Lenders qualify for this exception to distribution according to state lien priority law. Specifically, they argue that all were similarly situated with respect to Stevens in that all lent him money to develop his project and all were aware of the same promotional materials he provided with respect to the project. They further assert that all the funds provided to Stevens by both Investors and Lenders were commingled in the project and in Stevens' effort to make it succeed.

Burk Stevens and other Investors rely on two cases for their contention that they are "similarly situated" to the Lenders. They contend that in both a pro rata distribution was ordered despite the presence of both secured and unsecured claims.[3] However, the Special Master concludes that neither addressed the question of whether a claim secured by real property is "similarly situated" to a claim that is not so secured. See SEC v. Capital Consultants, LLC, 397 F.3d 733, 736 (9th Cir. 2004); SEC v. Elliott, 953 F.2d 1560, 1566 (11th Cir. 1992).

In addition, Burk Stevens asserts that the court in SEC v. Capital Consultants, L.L.C. did approve a pro rata distribution in a receivership matter when claimants were both secured and unsecured. 397 F.3d 733, 736 (9th Cir. 2004). The Special Master is unpersuaded. The opinion in the Capital Consultants suggests a case far different than this one. It involved a company that made investments for several hundred individuals. It had been given broad discretion to invest its client's money in publicly traded securities as well as private assets. The investment company was placed into a receivership because it had engaged in disloyal conduct, self-dealing, and had invested clients' money in nearly worthless loans. Id. Once the receiver took over, he immediately returned all the publicly-held securities to the clients in whose names they were held. The remaining estate included "administrative claims, one secured claim, vendor claims, investor claims, and other claims." Id. at 737. The court did not identify the "one secured claim", and Mr. Stevens does not explain how the presence of this secured claim makes the Capital

---

[3] Mr. Stevens and other investors place much weight in their claim of the propriety of a pro rata distribution upon Assistant United States Attorney Barbara Bearnson's statement at the December hearing that "[t]he Court may have authority to look at issues beyond lien priority" because restitution may be awarded in the criminal case currently pending against Baylor Stevens. The Special Master is aware of no law that suggests the existence of a potential remedy which might in the future flow from a pending criminal prosecution can be taken into account by a court having supervision over a receivership in determining that an otherwise unavailable civil remedy should be made available to defrauded parties in the distribution of receivership assets. The existence of any law to that effect seems unlikely, since the defrauder is innocent of fraud until convicted, and the mere fact of one's being charged cannot be legally relevant to the independent receivership proceeding. Here, Mr. Stevens may eventually convicted of fraud, but until that time, the receivership holding the proceeds of his property would appear governed by the same law as any other receivership. Because no further guidance has been provided by any party as to the full intention behind Ms. Bearnson's remarks, the Special Master declines to adopt the principle in support of which it is offered.

Consultants court's decision guiding as to whether the Lenders are similarly situated to the Investors here.

Returning to the factual argument of the Receiver and the Investors that the Lenders and Investors are similarly situated, the Special Master finds it fundamentally flawed. It is true that both the Lenders and the Investors gave money to Stevens in connection with his project. But even assuming that he indiscriminately spent their funds similarly, that certainly cannot be enough to make claimants "similarly situated" and justify overriding the state law of lien priority and ordering a pro rata distribution. Such a loose definition of "similarly situated" would be unworkable when applied to receiverships in general.

For example, it seems likely that almost anyone whose business goes into receivership has, by the time it fails, used a multiplicity of sources of funds to prop it up, from unsecured credit card debt, to unsecured loans from family and friends, to bounced checks, to secured first, second, and third mortgages. The fact that the proceeds of all these loans are commingled, even if all the lenders knew that the loans were being used for the same project, cannot be enough to override the complex of state law that allocates risks and responsibilities and priorities and remedies among the various creditors, and particularly between and among secured and unsecured lenders. It is fundamental to the law that secured lenders are differently situated from unsecured lenders. See Ticonic National Bank, 303 U.S. at 411-412. That fundamental difference is not so fragile that it can be disregarded simply because the borrower mixes the proceeds and puts it all into the same project and the lenders are all aware of the nature of the project.

The arguments of the Receiver and the Investors are factually unpersuasive. The Investors and the Lenders are not "similarly situated" and do not occupy the same legal position because the Investors' claims are not secured whereas the Lenders' claims are secured.

### C. The Investors' claims are not secured.

The Investors' final argument in support of a pro rata distribution is that they and the Lenders are similarly situated because both classes of claimants are "secured" under state law. Specifically, the Investors argue that their claims are secured by the Ledgemont and Jupiter Properties because they have recorded a document entitled a "notice of interest" against the two properties, and that some of them filed "trust deeds" against the properties after the receivership was in place. The "notices of interest" vary in form but all recite that the individual has a promissory note signed by Stevens and the note was intended to be secured by the property. The terms of the note and amount are then set out in the notice of interest. None of these are signed by Stevens. All appear to be dated and filed before the receivership was instituted.

None of these documents suffice under Utah or federal law to make the Investors secured creditors. First, the "notices of interest" do not qualify as documents creating interests in real property under Utah law. A trust deed (or other instrument) creating a security interest in real property must be a pledge by a borrower (trustor) of his interest in real property as security for an obligation owed to the lender (beneficiary). Utah Code Ann. §§ 57-1-19, 57-1-20. A valid security interest, including a trust deed, must be signed by both the lender and the borrower. Utah Code Ann. § 70A-9a-203(2). None of the "notices of interest" created and recorded by the Investors are signed by the borrower.

6

(See, e.g., Ex. A to 4/13/07 Burk Stevens Response to Receiver's Amended Third Status Report.) Therefore, they are not effective to create an interest in the property against which they purport to have been filed. As for the trust deeds, they were all signed and filed with the court after the date of the receivership's creation. As of that date, Stevens had no interest in the real estate that he could pledge as security. (See 1/30/06 Order (creating receivership estate and placing property under control of Court).) Therefore, none of the so-called "trust deeds" that he signed were effective to create a security interest.

Utah law determines what is required to make one a secured, versus an unsecured, lender. Here, that law has not been satisfied as to any of the Investors. Therefore, their claim to be similarly situated to the Lenders must fail.

### D.     This is not an appropriate situation for a pro rata distribution.

Having considered all the arguments of the Receiver and the Investors, the Special Master concludes that there is no basis in law or fact for ignoring Utah's law establishing the distinction between secured and unsecured creditors and the relative priorities between secured creditors. Therefore, the Special Master recommends that no generalized pro rata distribution of the proceeds of the sale of the properties be ordered.

### III.    DOES INTEREST CONTINUES TO ACCRUE DURING THE RECEIVERSHIP?

The second issue of general applicability before the Special Master is whether interest on the secured obligations of the Lenders continues to accrue after the date of the institution of the receivership. This has important implications for junior claimants because if interest has continued to accrue since December of 2005 on the loans of largest Lenders with the highest priorities, then the money available for claimants of lower priority has continued to erode.

Just as the state law right of Lenders to the relative priority of their liens does not change because of the creation of a receivership, the general rule is that the right of the Lenders to receive interest on the loans that are secured by those liens also is not affected. "The appointment of a receiver of the property of the litigant by a court of equity . . . does not deprive a claim of any interest bearing rights it may have." Clark on Receivers § 660 (1959). As Professor Clark further explains, "[w]hen liens are of different dignity, claims of a higher rank will be paid in full with interest during receivership, even if no assets are available to pay those of a lower grade." Id. at § 660(a).

The Tenth Circuit adopted this reasoning in Grubb v. FDIC, 833 F.2d 222 (10th Cir. 1987). There, it held that "a secured creditor is entitled to interest on its claim to the extent of its security, regardless of whether that interest accrues before or after insolvency." 833 F.2d at 226, citing Ticonic National Bank, 303 U.S. at 412; see also Board of Comm'rs of Sweetwater County, Wyo. V. Bernadin, 74 F.2d 809, 814 (10th Cir. 1934) (holding that "[w]here, however, the assets are sufficient to pay all claims of equal dignity in full with interest accruing during the receivership after the costs of administration have been provided for, interest should be allowed and paid on all claims").

7

The Receiver and certain of the Lenders who have claims of a lesser priority than others argue that because a receivership is equitable, the law permits a court to stop the running of interest on a claim as of the date of the institution of the receivership when there are insufficient assets in the receivership to permit all the secured creditors to obtain the return of their principal. (See Reciever's 4/16/07 Mem. in Response to Washington Mutual's Motion for Summary Judgment (Secondary Issues) at 4-5.) The Special Master asked for and received extensive briefing from the parties on this issue. Having reviewed the cases and the treatises, it appears that the applicable law is as follows: The institution of a receivership does not stop the running of interest contracted for by a secured party any more than it interferes with the priority afforded such a party by state law. A general call on the "equitable" powers of the court is insufficient to override clear state law entitlements. See Grubb, 833 F.2d at 225; Clark on Receivers § 660 (noting that "appointment of a receiver cannot deprive a party to the suit or a claimant of his contractual rights"). However, if there are several creditors or claimants of a single priority, and the running of interest on all their claims after the institution of the receivership would result in the total amount of the claims exceeding the assets of the receivership, the court may exercise its equitable powers to stop the running of interest as of the date of the receivership. Clark on Receivers § 660 (interest will be paid on claims that bear interest "provided there are funds or there is property sufficient to pay such claims in full with interest" if not, interest can be stopped on the date the receivership is created); Board of Comm'rs of Sweetwater County, Wyo., 74 F.2d at 815 ("[w]here, however, the assets are sufficient to pay all claims of equal dignity in full with interest accruing during receivership after the costs of administration have been provided for, interest should be allowed and paid on all claims"). Although this action abridges the contractual right of any one creditor, it abridges all of the same priority in equal proportion.

The Receiver and the junior secured Lenders rely on the cases in which such a tolling of interest has been imposed, along with the more general statements about the equitable power of a court in a receivership, to argue that it would be appropriate to toll the running of all interest as of the receivership's institution so that more assets could be preserved for the more junior secured Lenders. (See Reciever's 4/16/07 Mem. in Response to Washington Mutual's Motion for Summary Judgment (Secondary Issues) at 11 citing Capitol Consultants, 397 F.3d at 738; United States v. Vanguard Investments Co., Inc., 6 F.3d 222, 226 (4th Cir. 1993).) However, the Special Master does not find that the case law or sound policy supports such an approach.

First, the cases and treatises, including Clark on Receivers, strongly support the proposition that any tolling of the running of interest on secured claims is appropriate only when all of the claims are of the same priority. Clark on Receivers § 660(a). If applicable law makes distinctions between several classes of secured claimants, the more senior as a class are entitled to exhaust all of their claims before any assets are available to a more junior class of secured creditors. Board of Comm'rs of Sweetwater County, Wyo., 74 F.2d at 815 ("[w]here there are claims of different rank or dignity and there are sufficient assets of the estate available to pay claims of a higher rank in full interest accruing during receivership, interest will be paid on such claims to the date of payment, even though what remains is insufficient to pay claims of a lower rank"). Here, there appear to be several classes of creditors, based on the priority of their security interests

8

and the property against which their liens apply. Therefore, the law does not support a general tolling of all interest as of the date of the receivership.

Second, no particularized equitable basis has been advanced that would warrant preferring the junior secured claimants over the more senior, and it is clear that to toll all running of interest for all claimants in all classes would do just that. The only suggestion of an equitable basis for a general tolling seems to be a variation on the argument made by the Receiver and the Investors that because the proceeds of the sale of the properties is insufficient to return all their money to both the Investors and Lenders, the court should override state law and contract rights to make everyone's pain equal. (See Receiver's 4/16/07 Mem. in Response to Washington Mutual's Motion for Summary Judgment (Secondary Issues) at 5; 4/13/07 Motion by Burk Stevens for Pro Rata Distribution at 5.) The Special Master does not find this argument any more persuasive when it is directed to eliminating differences between classes of secured creditors than when made to eliminating differences between the secured creditors and the unsecured.

The United States Constitution specifically states that contractual rights are not to be impaired. U.S. Const. Art. I, § 10, cl. 1. That does not mean that contractual rights trump all, but it does mean that they are not to be lightly disregarded. That general theme seems to ground all the case law and the treatises on receiverships and on when equity can be relied upon as a basis for declining to make minute calculations of legal rights in the face of overriding complexity and a lack of certainty regarding the facts, so as to permit the distribution of proceeds pro rata. None of that applies here. The facts are clear, the rights of the parties under the law certain, and the only real inequity is that Stevens was able to persuade his friends and relatives to give him money for his project without their demanding security. The Lenders were not so trusting, probably because they are in the business of lending, and the Investors are not. The consequences may be harsh for the Investors, but the law is clear. Equity has its limits, and they fall short of where the Receiver, the Investors, and the junior Lenders want them to be.

The Special Master concludes that there are no equitable grounds for tolling the running of interest across all classes of secured lenders. Within each class of secured lenders, the recommendation is that all be entitled to recover their principal and interest through the date of payment by the Receiver. In the event that there are insufficient funds to pay an entire class of secured lenders the full amount due them, then the Special Master recommends that the members of that class be paid pro rata based on the full amount of their claims, including interest through the date of payment.

The Special Master does find it equitable that each secured creditor only be able to recover simple interest on the amount of their loan. To the extent that some of the lenders are contractually entitled to additional penalties for non-payment of their loans, and the non-payment has resulted only from the fact of the receivership having been initiated, then the amount of all such penalties should be disallowed. Accordingly, the default interest to which Lighthouse asserts is entitled should be disallowed. (4/23/07 Lighthouse Capital Reply in Support of Motion for Summary Judgment (Doc. # 237) at 7-8.) For one creditor to gain a right to an additional payment over another solely because the pendency of the receivership prevented the timely payment on its claim would be inequitable to all the other creditors of that class.

9

## CONCLUSION

It is the Special Master's recommendation that: (i) the assets of the receivership be distributed according to lien priority as determined by Utah law; (ii) in calculating the amount due to each claimant for purposes of making the distribution, interest should continue to run at the rate provided in the respective agreements through the date of the payment to the claimant, except that no penalty for non-payment included in any contract should accrue after the date of the institution of the receivership; and (iii) to the extent that there are insufficient assets to pay all the claims of equal priority, then the claims within that class should be paid pro rata.

In a second report and recommendation the Special Master will address the remaining issues among the Lenders.

Dated: June 7, 2007

Michael D. Zimmerman
Special Master

445011

10